ORDERED.

Dated: September 29, 2015

Cynthia C. Jackson
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

In re:

MICHAEL SCHILL, JR.,                    Chapter 7
                                        Case No.: 6:13-bk-07635-CCJ

    Debtor.
_____/
ATLANTIC WELLNESS CHIROPRACTIC, D.C.,

    Plaintiff,

v.                                      Adv. Pro. No. 6:13-ap-00176-CCJ

MICHAEL SCHILL, JR.,

    Defendant.
_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case came before the Court for a three-day trial on the dischargeability of debt asserted in the Second Amended Complaint (Doc. No. 45; the "Second Amended Complaint").

At the conclusion of the trial, the Court requested proposed findings of fact and conclusions of law from the parties, which they timely submitted on March 9, 2015.[1] Having considered the evidence and the arguments of the parties, both in court and by their prepared findings of fact and conclusions of law, the Court finds in favor of the debtor on all Counts of the Second Amended Complaint.

Facts

The suspicions and allegations underlying this dispute arise from misdeposited checks for services rendered by the parties' chiropractic practices, which they operated informally as a consolidated joint venture. The main players here are the debtor--Dr. Michael Schill--who owned and operated Elmwood Park Chiropractic and Physical Therapy ("EPCPT"),[2] and Dr. Henry Cooke, who owned and operated the plaintiff, Atlantic Wellness Chiropractic, D.C. ("Atlantic Wellness").

In 2001, the debtor and Dr. Cooke orally agreed to consolidate EPCPT and Atlantic Wellness as follows: (i) Atlantic Wellness would use and have full access to EPCPT's existing office space, staff, and billing, and (ii) Atlantic Wellness would reimburse EPCPT for one-half of the payroll and general overhead. Though their operations were combined in this manner, the debtor and Dr. Cooke continued to bill patients and insurance companies under the names of their separate chiropractic practices.

From 2001 to 2004, EPCPT used an outside billing service. In 2004, EPCPT took billing in-house; EPCPT's employees therefore became responsible for the following activities for both EPCPT and Atlantic Wellness: (i) maintaining a record of services rendered to patients (namely, what services were rendered and which doctor rendered them); (ii) sending bills to patients and

---

[1] (Doc. No. 91; Doc. No. 92).
[2] The debtor also operated his practice under the name Michael Schill, P.C.

insurance companies; (iii) noting if and when payment was received; and (iv) depositing payments into EPCPT's and Atlantic Wellness's separate bank accounts.

As the Court learned in detail, EPCPT used a program called EZ Bis to manage its billing. EZ Bis generated many of the billing records and mailings required to obtain payment from insurance companies, but required employees to input those records and manage payments received on the back end. The billing process from beginning to end typically went as follows:

1. A new patient enters the office.

2. A file is created for the patient in EZ Bis. An employee assigns a doctor to the patient in EZ Bis.

3. The assigned doctor performs a service.

4. An employee records the service in EZ Bis.

5. EZ Bis generates an insurance billing form. An employee mails the form to the insurance company.

6. The insurance company mails a check accompanied by an explanation of benefits ("EOB"). The check will be received by EPCPT along with *many* other similar checks in the daily mail.

7. An employee sorts the checks into piles for the doctor who performed the service. (The EOB identifies the doctor by his practice's tax identification number). The debtor himself would frequently do this personally.

8. An employee records that payment was received for the service in EZ Bis.

9. An employee deposits the check.

Atlantic Wellness contends that the debtor manipulated this process to cheat it out of monies owed to it for services that Dr. Cooke rendered.

*First*, Atlantic Wellness contends the debtor wrongfully sorted into EPCPT's pile checks that were for services rendered by Dr. Cooke. This would result in an employee depositing Atlantic Wellness's check into EPCPT's account.

*Second*, Atlantic Wellness argues that the debtor entered the EZ Bis system and changed the doctor assigned to the service rendered. The debtor would accomplish this by manipulating the "doctor code"[3] in the patient's EZ Bis file. This second step was allegedly designed to cover the debtor's tracks. Periodically, EZ Bis would generate a report of payments received and outstanding. By changing the doctor code to a fictitious doctor code (belonging to nobody), the report would not reflect the fact that payment was received, so--as far as Dr. Cooke would know--the payment would never be received, and he would not know that he was being shorted.

Through this scheme, Atlantic Wellness contends, the debtor misappropriated between 673 checks worth approximately $233,000.00. To put this in perspective, from 2004 to 2008 (the period during which EPCPT handled Atlantic Wellness's billing), EPCPT and Atlantic Wellness received roughly 40,000 checks.

On the basis of the misdeposited checks, Atlantic Wellness sued the debtor in New Jersey state court. That case ended with a Stipulation of Dismissal and a Consent Final Judgment against the debtor in the amount of $225,000.00.[4] Shortly after entry of the Consent Final Judgment, the debtor filed this Chapter 7 case. By the Second Amended Complaint, Atlantic Wellness contends that the Consent Final Judgment is nondischargeable pursuant to Sections 523(a)(2)(A) and (a)(4) of the Bankruptcy Code.

In support of its nondischargeability, Atlantic Wellness provided evidence that (i) the debtor would sort mail, (ii) the debtor would sit as his computer in the office, (iii) the changes in

---

[3] Each doctor at EPCPT and Atlantic Wellness was assigned a doctor code for EZ Bis.
[4] (*See* Doc. No. 45-1, at 11–20).

4

EZ Bis to the doctor assigned were made using the username assigned to the debtor, and (iv) the misdeposited checks and changed doctor codes would result in a benefit to the debtor. Atlantic Wellness also points to the sheer volume of misdeposited checks and what it argues are altered billing records.

Regarding the changed doctor codes, Atlantic Wellness retained an expert, Mr. Brian Auerbach,[5] who testified that a doctor code could not be changed by accident in EZ Bis. That is, to change the doctor code, an individual would have to perform two steps manually. According to Atlantic Wellness's expert witness, the EZ Bis "audit logs" (which log the activities of each user) and "activity logs" (which contain the account activity for each patient) indicate that the debtor's EZ Bis account was used to change doctor codes to the fictitious doctor code.

The debtor confronts Atlantic Wellness's evidence with testimony from the debtor and EPCPT's office manager, Ms. Kim Faro, indicating that (i) the debtor did not sort mail *every* day, only the days that he came into the office (around three days per week), and (ii) the debtor did not have anywhere near exclusive use of his office computer, in fact, he would log into it and let others use it.

The debtor also credibly testified that (i) in some instances Dr. Cooke instructed the debtor to retain checks for services performed by Dr. Cooke in exchange for record keeping and note taking that the debtor would complete on Dr. Cooke's behalf, (ii) occasionally EZ Bis doctor codes would be manipulated for billing purposes at Dr. Cooke's behest when Atlantic Wellness could not bill a patient's insurance, but EPCPT could, and (iii) on at least 21 prior

---

[5] Atlantic Wellness offered Mr. Brian M. Auerbach as an expert witness regarding computer software and computer data. (*See* Doc. No. 94-2, at 18-19). The debtor objected to permitting Mr. Auerbach to testify as an expert, arguing that he is not independent and that he lacks sufficient experience operating EZ Bis to testify about it. (*See id.* at 23). The Court assumes for the sake of argument that the plaintiff has provided sufficient foundation for this Court to treat Mr. Auerbach as an expert.

occasions checks owing to Atlantic Wellness were misdeposited into EPCPT's account and the debtor accounted for those misdeposited checks to Dr. Cooke.

Discussion

By the Second Amended Complaint, Atlantic Wellness seeks to except its judgment debt from discharge as a debt for fraud, embezzlement, larceny, and a willful and malicious injury. The plaintiff bears the burden of showing the elements of each these exceptions to discharge by a preponderance of the evidence.[6]

Causation and intent are critical to each of the grounds for nondischargeability alleged here. For fraud under Section 523(a)(2)(A) of the Bankruptcy Code, the plaintiff must show: "[1] *the debtor made a false statement* with the *purpose and intention* of deceiving the creditor; [2] the creditor relied on such false statement; [3] the creditor's reliance on the false statement was justifiable; [4] and the creditor sustained damage as a result of the false statement".[7] For embezzlement under Section 523(a)(4), the plaintiff must show "the [1] *fraudulent* [2] *appropriation of money* [3] by a person to whom the money has been entrusted or into whose hands it has come lawfully".[8] For larceny under Section 523(a)(4), the plaintiff must show "the [1] *fraudulent* [2] *taking and carrying away the property of another* [3] with *intent to convert* such property to his use without the consent of another".[9] And for a willful and malicious injury under Section 523(a)(6), the plaintiff must show (1) "an *intentional or deliberate act*, which was not done merely in reckless disregard of the rights of another",[10] (2) "the *purpose of which is to*

---

[6] *See Grogan v. Garner*, 498 U.S. 279, 286–87 (1991).
[7] *Fuller v. Johannessen (In re Johannessen)*, 76 F.3d 347, 350 (11th Cir. 1996) (emphasis added).
[8] *Chrysler First Comm. Corp. v. Nobel (In re Nobel)*, 179 B.R. 313, 315 (Bankr. M.D. Fla. 1995) (emphasis added).
[9] *Marbella, LLC v. Cuenant (In re Cuenant)*, 339 B.R. 262, 277 (Bankr. M.D. Fla. 2006) (internal quotation marks omitted) (emphasis added).
[10] *Hope v. Walker (In re Walker)*, 48 F.3d 1161, 1163 (11th Cir. 1995) (internal quotation marks omitted).

*cause injury* or which is *substantially certain to cause injury*",[11] and (3) that is "wrongful and without just cause or excessive even in the absence of personal hatred".[12]

For each of these grounds for nondischargeability, the Court may infer fraudulent intent from the circumstances of the case and the debtor's conduct. For fraud, "[d]irect evidence of intent is rarely available, thus the Court may infer intent to deceive from all the circumstances in a case".[13] And for embezzlement and larceny, "[f]raudulent intent may be inferred from surrounding circumstances and the conduct of the accused".[14] If the creditor provides sufficient circumstantial evidence of the debtor's fraudulent intent, then the debtor "cannot overcome that inference with an unsupported assertion of honest intent. Instead, the court should consider whether the [debtor's] actions appear so inconsistent with [her] self-serving statement of intent that the proof leads th[e] court to disbelieve the debtor".[15]

For each of these grounds, Atlantic Wellness has failed to carry its burden of showing the debtor's fraudulent intent. While Atlantic Wellness has shown that the debtor *could have* intentionally misdeposited the checks, it has not shown that it was *likely* that he did so. Specifically, Atlantic Wellness has failed to overcome the substantial possibility of error when dealing with a volume of tens of thousands of checks.

The billing procedure employed by EPCPT left many avenues for errors that have not been sufficiently ruled out by the evidence presented. For instance, because one employee could have sorted checks and another employee could have stamped the sorted piles for deposit, there is a substantial likelihood that an entire pile of checks could have been stamped for one practice

---

[11] *Id.* at 1165.
[12] *Id.* at 1164 (internal quotation marks omitted).
[13] *Mendez v. Cram (In re Cram)*, 178 B.R. 537, 540 (Bankr. M.D. Fla. 1995).
[14] *Cunningham v. Cunningham (In re Cunningham)*, 482 B.R. 444, 448 (Bankr. N.D. Ala. 2012).
[15] *Id.*

7

or another. And, as the debtor testified, errors were known to occur--and the debtor rectified them.

To complicate matters, in some instances Dr. Cooke would have the debtor retain certain checks as payment for administrative work performed by the debtor. No record of this arrangement--or a list of the checks involved--were offered into evidence by either party. Instead, the Court is left only to wonder how many of these checks are among the volume of checks submitted as evidence of the debtor's alleged fraud.[16]

Finally, the Court is left to grapple with the allegations of misreported and changed doctor codes. The Court finds the evidence presented on this topic is--at best--inconclusive. Turning to the testimony of the plaintiff's expert, the Court did not hear a helpful explanation of the EZ Bis screenshots (hundreds of them) contained in the plaintiff's exhibits.

By way of example, the expert went through two exhibits, one an "activity log",[17] the other an "audit log" for one of Dr. Cooke's patients.[18] Taken together, the expert testified, these exhibits show that the debtor altered the doctor code in a patient's EZ Bis file. The expert reached this conclusion by noting that the audit log showed that debtor's EZ Bis account had been used on March 18, 2008, to insert information into the activity log of this patient's file. Looking, then, to the activity log entries for March 18, one sees that two payments are posted to a fictitious doctor code that did not correspond to Dr. Cooke. This, the expert contends, indicates manipulation.

The Court, however, is skeptical of the expert's claims. As the expert testified, the audit log is supposed to be a running record of the actions taken in EZ Bis. In this case, the audit log

---

[16] When asked by the Court, even plaintiff's counsel declined to represent that every single one of the misdeposited checks offered into evidence resulted from the debtor's alleged scheme "because of the way that [the parties] did business". (Doc. No. 94-4, at 43–44).
[17] (Plaintiff's Ex. 3, at 001045).
[18] (Plaintiff's Ex. 3, at 001046; *see also* Doc. No. 94-2, at 52–61).

highlighted by the expert appears to be organized to show all activity related to this particular patient's account from March 11, 2008, until part of March 24, 2008 (it is cut off). If the Court could make such an easy correspondence between the audit log and the activity ledger as the expert proposes, then the Court could--for instance--investigate the entries for March 21, 2008, on the activity log to see whose EZ Bis account was used to post two additional payments to the fictitious doctor code. The Court is however, unable to do so, for no entries correspond to March 21, 2008 on the audit log.

And who knows what these missing entries on the audit log would have shown? It is possible that the missing entries would have shown more activity with the debtor's account, which would undermine the debtor's case. But the missing entries could have--instead--shown a mistake made by another employee, which would undermine the plaintiff's case.

This is no small problem. The plaintiff would have the Court credit the expert's opinion that there were "probably thousands of edits" to "80 or 90" patient files in EZ Bis.[19] But this discrepancy in the expert's explanation undermines the value and credibility of his testimony and the value of the EZ Bis screenshots.

Even if the Court placed greater weight on the expert's testimony, its value is still limited. All that it potentially shows is that *someone* used the debtor's account to mis-credit payments owing to Dr. Cooke in EZ Bis. It is certainly possible that it was the debtor, but Ms. Faro's credible testimony supports the theory that someone else could have made the changes with the debtor's unattended computer.

Though Atlantic Wellness points to many misdeposited checks and changed doctor codes, the circumstantial evidence placing the debtor at the scene intentionally changing doctor

---

[19] (Doc. No. 94-2, at 68).

codes is just too thin.  Atlantic Wellness's failure to account for the substantial doubts cast by the points discussed above is fatal to its case.

The answers to all of the substantial doubts highlighted above may be in the mountain of materials (totaling a few thousand pages) submitted to the Court--and the Court has made a diligent effort to find them.  But the Court is not in a place to sift through the voluminous records to make Atlantic Wellness's case.[20]

## Conclusion

For the reasons set forth above, the Court finds in favor of the debtor on all Counts of the Second Amended Complaint.  The debt in question will be discharged.

Clerk's office to serve

---

[20] *See, e.g.*, *Preis v. Lexington Ins. Co.*, 508 F. Supp. 2d 1061, 1068 (S.D. Ala. 2007); *Hughes v. Stryker Sales Corp.*, Civil Action No. 08-0655-WS-N, 2010 WL 1961051, at *3 (S.D. Ala. May 13, 2010); *LaBauve v. Olin Corp.*, 231 F.R.D. 632, 642 n.18 (S.D. Ala. 2005).